**VENTURA BROADCASTING CO., Ventura, California, Appellant,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Absolutely Great Radio, Inc. and William Shearer et al., Intervenors.**

**William SHEARER et al., Appellants,**

v.

**FEDERAL COMMUNICATIONS COMMISSION, Absolutely Great Radio, Inc., Intervenor.**

Nos. 83–2167, 84–1227.

United States Court of Appeals, District of Columbia Circuit.

Argued March 12, 1985.

Decided June 18, 1985.

David D. Oxenford, Washington, D.C., with whom Martin R. Leader and Clifford M. Harrington, Washington, D.C., were on brief, for appellant in No. 83–2167.

Walter E. Diercks, Washington, D.C., with whom James L. Winston, Washington, D.C., was on brief, for appellants in No. 84–1227 (intervenors in No. 83–2167).

C. Grey Pash, Jr., Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on brief, for appellee.

Lee J. Peltzman, Washington, D.C., with whom B. Jay Baraff and Aaron Shainis, Washington, D.C., were on brief, for intervenor Absolutely Great Radio, Inc.

Before WRIGHT, TAMM and MIKVA, Circuit Judges.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Circuit Judge.

This case consists of two consolidated appeals from a comparative licensing proceeding conducted by the Federal Communications Commission to select one of three mutually exclusive applicants to construct an FM radio station in Ventura, California. Following a hearing before an FCC Administrative Law Judge (ALJ) and an appeal to the FCC Review Board, the Commission, on discretionary appeal, granted the license to Absolutely Great Radio, Inc. (AGR).

The two other applicants, Ventura Broadcasting Co. (Ventura) and the marital joint tenancy of Mr. William Shearer and Dr. Arike Logan-Shearer (Shearers) now appeal from that licensing decision. Ventura contends that the FCC's decision was not sup-ported by substantial evidence, that the FCC erred in allowing AGR integration credit for participation by its alien owner, and that the Commission failed to follow its own procedures in considering Ventura's appeal from the Review Board's decision. The Shearers contend that the FCC's decision not to award them 100 percent integration credit is arbitrary and capricious and an unexplained departure from prior FCC policy.

With respect to Ventura's claims, we conclude that the Commission's decision was procedurally adequate, consistent with its governing statute, and supported by substantial evidence in the record. With respect to the Shearers' arguments, however, we conclude that the Commission insufficiently explained its departure from prior FCC policy. Consequently, we vacate the grant of the license to AGR and remand the case for further proceedings in accordance with this opinion.

## I. Factual Background

### A. *Initial Decision*

As noted above, this case involves three mutually exclusive applications to construct an FM radio station in Ventura, California. The FCC having determined that all three applications met the minimum applicant requirements, the applications were designated for a comparative hearing before an ALJ. *See Absolutely Great Radio, Inc.,* 92 FCC2d 1183, 1183–1184 (ALJ 1982) (hereinafter *Initial Decision* ), Joint Appendix (JA) at 1, 1–2. At the hearing, the ALJ took evidence relating to the question of which applicant would best serve the public interest according to the criteria set forth in the Commission's *Policy Statement on Comparative Broadcast Hearings,* 1 FCC2d 393 (1965) (hereinafter *Policy Statement* ). *See generally West Michigan Broadcasting Co. v. FCC,* 735 F.2d 601, 604–605 (D.C.Cir.1984) (summarizing *Policy Statement* requirements).

■ Under the *Policy Statement,* "there are two primary objectives toward which the process of comparison should be direct-

ed. They are, first, the best practicable service to the public, and, second, a maximum diffusion of control of the media of mass communications." 1 FCC2d at 394. In the *Policy Statement,* the Commission set forth six factors to be considered in evaluating the relative merit of various applications for the public interest. One of these factors is the proposed integration of the ownership and management of the broadcast station.[1] Integration, in this context, is the extent to which the owners of the station will participate in running the station on a daily basis. As the Commission noted in the *Policy Statement,*

> there is a likelihood of greater sensitivity to an area's changing needs, and of programing designed to serve these needs, to the extent that the station's proprietors actively participate in the day-to-day operation of the station. This factor is thus important in securing the best practicable service. It also frequently complements the objective of diversification, since the concentrations of control are necessarily achieved at the expense of integrated ownership.

*Id.* at 395 (footnote omitted).

The ALJ in this case determined that the applications were equivalent with respect to each of the six factors in the *Policy Statement* except for the integration criterion. On the basis of the integration criterion, however, the ALJ determined that AGR should be granted the license. *See Initial Decision,* 92 FCC2d at 1205–1207, JA 23–25.

The ALJ's analysis of the applications in terms of the integration criterion was performed, as it normally is, in two steps. First, the ALJ looked at quantitative integration. He concluded that the Shearers' application was entitled to less than 100 percent quantitative integration and that the other two were entitled to 100 percent. *See id.* at 1205, JA 23. With respect to the

Shearers' application, the relevant facts were as follows: The Shearers proposed to hold the station as joint tenants. *See id.* at 1196, JA 14. The funds for operating the station were to come from Dr. Logan-Shearer's assets. *See* JA 133. Both Mr. Shearer and Dr. Logan-Shearer planned to participate actively in making decisions regarding the station, and each regarded himself or herself as having a 50 percent interest in the station. *See Initial Decision,* 92 FCC2d at 1196, JA 14. Mr. Shearer planned to manage the station on a full-time basis. *See id.* His wife, however, planned to participate only part time. *See id.* at 1197, JA 15.

Based on these facts, the ALJ gave the Shearer application only 50 percent integration credit for Mr. Shearer's participation and something less than that for Dr. Logan-Shearer's—adding up to less than the 100 percent quantitative credit given to both of the other two applicants. *See id.* at 1204, JA 22. To reach this conclusion, the ALJ distinguished three previous FCC cases in which "spousal attribution" had been allowed for ownership interests held in joint tenancy by married couples. In those cases, where one spouse was to be fully integrated (*i.e.,* was to participate in managing the station on a full-time basis), the joint tenancy was allowed full integration credit. For example, if the marital joint tenancy owned 50 percent of the stock of an applicant and one spouse was to participate full time, 50 percent integration credit was allowed; the non-participation of the other spouse was not applied to diminish this credit. In essence, the non-participating spouse's interest in the joint tenancy was "attributed" to the participating spouse for integration purposes: Integration was calculated as if the participating spouse were the sole own-

---

1. The other factors are diversification of control of the media of mass communications, proposed programming, past broadcast record of the applicants, efficient use of the frequency, and character of the applicants. *See Policy* *Statement,* 1 FCC2d 393, 394–399 (1965); *West Michigan Broadcasting Co. v. FCC,* 735 F.2d 601, 604–605 (D.C.Cir.1984). The Commission will also consider other "relevant and substantial" factors. *See Policy Statement,* 1 FCC2d at 399.

er of the interest. Hence "spousal attribution" was allowed.[2]

In the Shearers' case, however, the ALJ distinguished the "spousal attribution" cases as ones where one spouse did not intend to participate actively in running the station at all. *See id.* The ALJ determined that since both Shearers *would* participate, the integration of each spouse would be calculated separately. Consequently, the Shearers received 50 percent integration credit for Mr. Shearer's full-time participation with respect to his 50 percent interest and less than 50 percent integration credit for Dr. Logan-Shearer's part-time participation with respect to her 50 percent interest.

On the basis of the quantitative comparison, the ALJ concluded that the Shearers' application was clearly inferior to the other two applications and therefore rejected it. *See Initial Decision*, 92 FCC2d at 1205, JA 23 (*citing Van Buren Community Service Broadcasters, Inc.*, 87 FCC2d 1010, 1022 (Rev.Bd.1981)). Then, since the other two applications had both received 100 percent quantitative integration credit, the ALJ looked at the qualitative integration enhancement factors: minority and/or female ownership, residence of the owners in the service area of the station, civic participation of the owners in that area, and the past broadcasting experience of the owners.

The facts relevant to this determination were as follows. *See id.* at 1184–1195, 1205–1206, JA 2–13, 23–24. Ventura was to be owned by two men: Thomas, a local resident with much broadcasting experience who would manage the station (85% owner), and Dela Pena, a non-local minority resident with a lot of experience in the engineering aspects of broadcasting but not much in other areas, who the ALJ

found would participate mostly in the technical rather than in the programming aspects of managing the station (15% owner).

AGR was to be owned by the Sylvesters, a married couple (Mr. Sylvester, 51% owner, and Mrs. Sylvester, 34.5% owner) and Ms. Luz Lara, a woman who was an Hispanic (and thus a minority) resident alien (14.5% owner). The Sylvesters were local residents, and the husband had significant broadcasting experience. Ms. Lara was not a local resident and had no broadcasting experience, but was to be trained to occupy a significant programming management position.

Based on these facts, the ALJ found that the AGR application was entitled to more credit because of the substantial female and minority ownership and because AGR's minority owner would occupy a more substantial managerial position than Ventura's. Consequently, although the ALJ found that the qualitative enhancements for the other relevant factors would weigh slightly in Ventura's favor,[3] he held that AGR's was the better application and granted the license to AGR.

## B. *Review Board Decision*

Both Ventura and the Shearers appealed from the ALJ's decision. The Shearers asserted on appeal that the ALJ's failure to attribute Dr. Logan-Shearer's interest to her husband for quantitative integration purposes was incorrect and should be reversed. In making this assertion, the Shearers relied primarily on a previous FCC Hearing Examiner decision, which had appeared to contemplate the universal attribution of spousal interests held in joint tenancy regardless of the activity or passivity of each spouse in terms of exercising ownership responsibilities. *See Absolutely*

---

**2.** It should be noted here that this "spousal attribution" phenomenon has apparently occurred only in the joint tenancy context. Other interests held by married couples seem to be uniformly treated separately for integration evaluation purposes. *See, e.g., Ottumwa Broadcasting Co.*, 52 Rad.Reg.2d 1447, 1451 (Rev.Bd. 1982); *Alexander S. Klein, Jr.*, 86 FCC2d 423, 428 (1981).

**3.** The ALJ awarded a slight preference to Ventura for local residence and past broadcast experience and found Ventura and AGR equal in terms of civic participation. *See Initial Decision*, 92 FCC2d 1183, 1205–1206 (ALJ 1982), JA 23–24.

*Great Radio, Inc.*, 92 FCC2d 1171, 1173 (Rev.Bd.1983) (hereinafter *Review Board Decision* ), JA 26, 28.

Ventura, on the other hand, attacked both the quantitative and qualitative integration determinations of the ALJ. First, Ventura asserted that AGR should not receive any integration credit for minority ownership because Ms. Lara is an alien and Congress enacted a policy against alien control of radio stations. *See* Ventura Exceptions 5–12, JA 73–80. Ventura also asserted that the ALJ had made various errors in weighing the evidence. Perhaps the most significant of these was the argument that Ventura merited more minority integration credit for Mr. Dela Pena's participation than AGR deserved for Ms. Lara's: The contention was that Mr. Dela Pena had more experience, even though Ms. Lara was to have, on paper, a more substantial managerial role. *See id.* at 16–19, JA 84–87.

The Review Board considered the appeals and reversed the ALJ's decision. The Review Board found that the ALJ had improperly failed to grant the Shearer application 100 percent quantitative integration credit. The Review Board concluded that it made no sense to allow full integration credit where joint tenant spouses testified that they would be passive and to deny such credit where spouses testified that they would be active. Such a policy, said the Review Board, would both discourage additional, desirable participation by joint tenant spouses and would require inquiring into the details of the marital relationship. Further, the Review Board held that, because marital interests are essentially unitary, considering them as one interest makes factual sense: The Board noted that marriages, like joint tenancies, are run by agreement rather than by voting battles. *See Review Board Decision,* 92 FCC2d at 1173–1176, JA 28–31.

With all three applicants thus receiving 100 percent quantitative integration credit, the Board decided that the license should go to the Shearers: They were both black, so there was a 100 percent minority owner-ship (and 50% female ownership) enhancement, and Mr. Shearer had substantial broadcast experience. Thus they were the preferred candidate, even though they were not local residents (a criterion of lesser importance). *See id.* at 1180–1181, JA 35–36.

### C. *Commission Decision*

Both AGR and Ventura appealed the Review Board's decision to the full Commission. The issue raised in both appeals was the spousal attribution issue. The FCC granted review, reversed the Review Board, and, without additional briefing or argument, essentially reinstated the decision of the ALJ. *See Absolutely Great Radio, Inc.,* 95 FCC2d 1023 (1983).

With respect to the spousal attribution question, the Commission held that where, as with the Shearers, ownership of the station was to be split 50/50 between spouses, full integration credit should not be allowed because "*actual* participation and legal ownership [were required to be] physically commingled." *See id.* at 1026, JA 42 (emphasis in original). The Commission would, it said, award credit only where those with legal responsibility would actually participate in the daily management of the station. *See id.* Since neither spouse here agreed to defer to the other spouse, attribution, the Commission held, was inappropriate. *See id.* at 1028, JA 43.

The Commission then considered and rejected Ventura's additional contentions about the ALJ's selection of AGR and granted the license to AGR. Both the Shearers and Ventura now appeal from the Commission's decision.

### II. STANDARD OF REVIEW

█ In reviewing the Commission's selection of a particular application on the basis of a comparative evaluation, we must assure ourselves that the Commission has engaged in reasoned decisionmaking. As with review of agency adjudications generally, we must ascertain that the agency " 'has given reasoned consideration to all the material facts and issues,' " *Cleveland*

*Television Corp. v. FCC,* 732 F.2d 962, 972 (D.C.Cir.1984) (*quoting Central Florida Enterprises, Inc. v. FCC,* 598 F.2d 37, 49 (D.C.Cir.1978)), and that its factual findings are supported by substantial evidence. *See Central Florida, supra,* 598 F.2d at 49. Further, if the agency departs from prior policy in case-by-case adjudication, we will require that it do so only with " 'a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.' " *West Michigan Broadcasting Co. v. FCC, supra,* 735 F.2d at 608 (*quoting Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)).

These requirements serve two basic functions. First, they ensure that the agency's decisionmaking in any particular adjudication is reasoned—whether its approach is new or established. Second, they ensure that the agency acts consistently or, if it changes course, that it do so only for rational reasons that are sufficiently explained. With these guidelines in mind, we turn to the arguments before us.

III. REVIEW OF THE COMMISSION'S DECISION

On this appeal the Shearers again raise the spousal attribution argument that they successfully raised before the Review Board. Ventura raises the arguments it raised before the Review Board and argues in addition that the Commission's decision was procedurally improper. The Commission, Ventura contends, should not have decided to grant the license to AGR without giving Ventura a chance to brief and argue its points of disagreement with the ALJ's factual findings and ultimate decision. We address each of these contentions below.

4. On review of the Hearing Examiner's decision, the Review Board reversed on other grounds, noting that "[b]ecause our analysis turns on somewhat different considerations, we need not and do not reach the question of the quantum of credit to be given where stock is owned jointly but only one of the joint stockholders will participate in station affairs." *East St. Louis Broadcasting Co.,* 19 FCC2d 289, 295 n. 10 (Rev.Bd. 1969).

A. *The Spousal Attribution Decision*

■ The Shearers contend that the Commission's decision not to allow spousal attribution in this case was inconsistent with the *Policy Statement* and with the Commission's own prior precedents and was arbitrary and capricious. To evaluate the merits of these arguments, we must first examine the decisions and statements that existed at the time of this decision.

1. Policy Statement *criterion.* The *Policy Statement,* in which the Commission outlined the general fundamentals of the integration criterion, refers to the "[close association of] legal responsibility and day-to-day performance" and the "[active participation of] the station's proprietors * * * in the day-to-day operation of the station" in describing that criterion. 1 FCC2d at 395. These general formulations clearly indicate that the crux of the integration calculus is the coincidence of legal responsibility for and actual participation in the station.

2. *Prior FCC cases concerning attribution of marital joint tenancy interests.* The first FCC decision to address spousal ownership interests held in joint tenancy was *East St. Louis Broadcasting Co.,* 19 FCC2d 300 (Hearing Ex.1969), *aff'd,* 29 FCC2d 170 (1971). In allowing attribution in that case, the Hearing Examiner clearly contemplated that one joint tenant spouse's full-time participation would always merit 100 percent integration credit for the interest held in joint tenancy regardless of the participation of the other spouse.[4] The Hearing Examiner did not address any possible relevance of single or dual control over ownership decisions by one or both spouses of the joint tenancy:

> The Commission, however, reversed the Review Board and reinstated the Hearing Examiner's decision—including his integration determinations. But, although it adopted these determinations based on spousal attribution, the Commission did not explicitly address the spousal attribution issue. *See East St. Louis Broadcasting Co.,* 29 FCC2d 170 (1971).

In giving full credit for stock ownership where either a husband or wife holding a joint interest will be employed full time, the examiner has rejected the contrary view * * * that only one-half of the joint interest in such case should be credited to the applicant for integration purposes. Full-time employment in the day-to-day operation of a station on the part of either spouse sharing a joint interest is as beneficial with respect to integration as the service of an individual holding an identical but undivided interest. Of course, no extra credit can be awarded where both spouses having a joint interest participate full time or where one of them is employed full time and the other also participates on a part-time basis. *East St. Louis, supra,* 19 FCC2d at 346. Thus, in this case, the view adopted would have apparently allowed 100 percent credit where either spouse participated full time in managing the station, whether or not the other spouse exercised any ownership control over the joint tenancy.

Although it is not clear from the decision precisely what the Hearing Examiner based his decision on, it seems most likely from the explanation given that it was grounded in the peculiar nature of joint tenancy interests—specifically, in the idea that each joint tenant has an interest that runs to the whole property. *See* 20 Am. Jur.2d *Cotenancy and Joint Ownership* §§ 3–5 (1965). Under this theory, one joint tenant's participation in managing the station is like that of a single owner. And, under this theory, spousal attribution is consistent with the *Policy Statement*'s mandate that participation track legal responsibility: Where each joint tenant has an interest in the entire property, one person's participation is equivalent to 100 percent integration.

More than a decade then passed before this spousal attribution question arose again. Then, in *Bie Broadcasting Co.,* 81 FCC2d 40, 102–103, *rev'd on other grounds,* 81

FCC2d 1 (Rev.Bd.1980), a different Administrative Law Judge again allowed spousal attribution. In *Bie,* however, the ALJ did not rely on the reasoning of *East St. Louis.* Indeed, he did not even mention the *East St. Louis* decision.

Instead, the ALJ in *Bie* focused on the fact that the wife joint tenant planned not to participate in the daily affairs of the station and would defer to her husband in station operating matters. This fact—in conjunction with the ALJ's determination that the ownership interest (67.53% of the stock of the corporate applicant) was held in joint tenancy for estate planning purposes only, that the husband was the "moving force" in the application, and that the wife's interest "derive[d] solely from her husband" and was not intended to give her an interest separate from her husband's interest—led the ALJ to conclude that the husband, "as a practical matter, should be considered the actual holder" of the stock. *See Bie, supra,* 81 FCC2d at 102–103. Consequently, full integration for that ownership interest was allowed. The ALJ in *Bie* did not explicitly address how this "practical" analysis dovetailed with the *Policy Statement*'s emphasis on legal responsibility.

Two years later, the Review Board faced the spousal attribution issue squarely for the first time.[5] In *New Continental Broadcasting Co.,* 88 FCC2d 830, 838 (Rev. Bd.1982), the Board faced a factual situation similar to that in *Bie.* *See New Continental Broadcasting Co.,* 88 FCC2d 853, 869 (ALJ 1981). Based on these facts, the Review Board concluded that the husband was the "true and actual owner" of the entire ownership interest. Thus, since he was to participate full time in managing the station, full integration credit would be awarded for the entire interest owned by the joint tenancy.

In making this determination, the Review Board cited and borrowed language from another line of integration credit cases.

**5.** As noted above, the Review Board had identified but not addressed the issue in its *East St.* *Louis* decision. *See* note 4 *supra.*

This line of cases provides that when "true and actual ownership" departs from *de jure* ownership, "true and actual ownership" should be substituted for actual legal responsibility for purposes of determining integration. *See, e.g., Berryville Broadcasting Co.,* 70 FCC2d 1, 3–6, 10–11 (Rev. Bd.1978); *Henderson Broadcasting Co.,* 63 FCC2d 419, 423–426 (Rev.Bd.1977). These cases deal mostly with instances in which applicants set up legal ownership so as to acquire integration benefits where, in reality, the structure of the business did not merit integration credit.[6]

The Review Board in *New Continental* explicitly imported this "true and actual ownership" concept into the marital joint tenancy area. Emphasizing the fact that one spouse intended to let the other control the ownership interest, the Review Board held that "[t]he Commission only requires reasonable assurance, not a legal certainty, that an applicant will effectuate its integration as proposed." 88 FCC2d at 838.

The Review Board did not, however, explicitly indicate what the legal responsibilities in the case actually were, although it appears that it assumed that each spouse was a 50 percent owner of the joint tenancy property. (If it had used the legal theory of joint tenancies apparently adopted in *East St. Louis,* no "true and actual ownership" analysis would have been necessary to reach the result of allowing attribution. Thus, it apparently focused on the fact that joint tenants have equal 50/50 interests in the tenancy property rather than on the fact that each joint tenant's interest runs undivided to the property as a whole.) Nor did the Review Board differentiate the previous "true and actual ownership" cases, where looking beyond the legal form had served to prevent an applicant from using that form to benefit itself in the integration calculus, from the case at hand, where looking beyond the legal form apparently served to allow an applicant a benefit it would not otherwise have received.[7]

Having recited this "true and actual ownership" analysis and concluded that under this analysis spousal attribution was appropriate on the facts of the case, the Review Board went on to note that "New Continental's proposal is consistent with other husband-wife joint ownership cases, in which full quantitative credit has been given to the integrated spouse, and must be similarly treated." 88 FCC2d at 838 (*citing Bie, supra,* and *East St. Louis, supra* ). The Board did not elaborate by discussing the analytical approaches used in the earlier cases or their relationship to the approach used in *New Continental.*

3. *Review of FCC decision in this case.* It was against this background that the case at hand arose. In this case the Commission adopted without explanation the assumption of a 50/50 division of legal responsibility in joint tenancies. This determination of the legal effect of joint tenancies was then applied to the facts at hand—resulting in a separate calculation of the ownership interests of Mr. Shearer and Dr. Logan-Shearer for integration credit purposes.

The Commission then went on to indicate that if control of the joint tenancy interest was to be vested *de facto* in one spouse alone, attribution for integration purposes would be appropriate. This discussion by the Commission was apparently intended to reconcile the denial of spousal attribution in this case with the allowance of such attribution in the previous cases.

Both of the critical steps in the Commission's analysis, however, were inadequately

---

6. From these cases, two components of true and actual ownership can be discerned: The first is control and the second is essentially exclusive financial support. Thus, where a formal, legal owner has neither *de facto* control nor responsibility for financing the interest, the Commission will look beyond the legal structure.

7. In the earlier cases, the applicants had arranged the legal forms so as to obtain maximum integration credit. The Commission used the "true and actual ownership" approach to deny them such credit where the legal forms did not represent reality. Here, however, the legal form hindered maximum integration credit, and the "true and actual ownership" approach allows additional credit.

explained. First, the Commission stated baldly that legal responsibility in joint tenancies was divided 50/50. Although, as noted above, this theory of the legal force of joint tenancies was perhaps inherent in the Review Board's decision in *New Continental*, it was not the theory inherent in the *East St. Louis* decision. Yet the implicit departure from the *East St. Louis* theory was neither explicitly noted nor in any way explained either in *New Continental* or in the instant case. In *New Continental*, in fact, the Review Board actually noted that its result was consistent with that reached in *East St. Louis*. It may be true that either legal theory of joint tenancies would be permissible in this context. It is not true that this fact authorizes the Commission to switch from one to the other at whim.

Second, the Commission distinguished the situations in the earlier cases, where spousal attribution was allowed, from the situation at hand. In making this distinction, the Commission seemed to rely on the question whether one spouse exercised *de facto* control over the joint tenancy. This criterion, however, differs from that apparently adopted in *New Continental*, which in turn differed from that embodied in the previous "true and actual ownership" cases. As mentioned above, the pre-*New Continental* "true and actual ownership" cases provided for looking beyond the legal form when the legal form was used solely to obtain the benefits of integration but where it did not coincide with the "true and actual ownership" of the applicant. Further, in those cases, "true and actual ownership" was apparently measured by control and essentially exclusive financial responsibility.

In *New Continental*, the Review Board used "true and actual ownership" as a device to allow an applicant integration credit it would not have obtained based solely on legal responsibility. This use of the concept allowed applicants both to enjoy the

benefits of the chosen legal form and to avoid one of its burdens. The Review Board did not indicate why a strict reliance on legal responsibility, as indicated by the *Policy Statement*, was rejected in this context or why the "true and actual ownership" approach was appropriate to award rather than to restrict benefits. It did, however, apparently retain the dual definition of the "true and actual ownership" indicators.[8]

In this case, the Commission selected one component of the "true and actual ownership" analysis—*de facto* control—and elevated that to the status of sole governing criterion. It did not explain why the Review Board's decision in *New Continental* was appropriate in this context. Nor did it explain why it was altering that approach.

In sum, we are at a loss to understand the basis for the Commission's new approach. The Commission nowhere explained the reasons for adopting that approach. The Commission did not even indicate its awareness that that approach departed from (1) the *Policy Statement*, (2) *East St. Louis*, and (3) *New Continental*. Based on this lack of explanation, we conclude that the Commission did not adequately explain its decision in this case. Consequently, we vacate the decision and remand the case to the Commission for fuller explanation. We note that our decision does not represent a determination that the Commission's analysis or result here was substantively incorrect. It means simply that the Commission failed to adequately explain its reasons for reaching that result and its apparent divergence from its previous policies.

### B. *The Selection of AGR Over Ventura*

■ 1. *Ventura's procedural claim.* Ventura's first argument is purely procedural. Ventura argues that the Commission erred by reaching a decision on the qualitative integration comparison without allowing briefing or oral argument on the

---

**8.** The facts in *New Continental* indicated both that the husband would exercise exclusive control over the joint tenancy interest and that the husband was the financial force behind the interest (the wife's interest "derived solely from" her husband).

relevant issues raised by Ventura. (The briefing before the Commission focused entirely on the spousal attribution issue. Ventura's arguments there, it contends, focused on that issue because of lack of space allowed in the applications for review.) Ventura argues that once the Commission decided to reverse the Review Board on the spousal attribution 'issue it should have allowed Ventura to brief and argue Ventura's contentions that it, rather than AGR, should have been awarded the license.

Ventura bases its argument on a provision in the Commission's rules that the Commission will generally allow oral argument and briefing when it decides to review a case. (Such review is discretionary.) *See* 47 C.F.R. § 1.115 (note) (1984). The Commission, however, explained in its decision that it did not allow them here because it believed neither would "significantly contribute to [its] understanding of the matters raised in the applications for review." *Absolutely Great Radio, Inc., supra*, 95 FCC2d at 1025 & n. 5.

In this case, we find that the Commission's decision not to allow such argument and briefing did not violate its own rules (which do not mandate argument and briefing in every case) or render ineffective or procedurally unfair the Commission's review of the ALJ's decision. The exceptions made by Ventura to the ALJ's decision in favor of AGR, exceptions in support of its appeal to the Review Board, were in the record available to the Commission when it reviewed the Review Board's decision. *See* Ventura Exceptions to *Initial Decision* 5–29, JA at 73–97. Thus, Ventura's arguments were fully presented to the Commission. In sum, we do not see that the Commission in this case either violated its own rules or acted without adequate opportunity for comment on the part of Ventura.

■ 2. *Ventura's alien ownership credit claim.* Ventura's first substantive argument is that the Commission should not have awarded any integration credit (quantitative or qualitative) to AGR for Ms. Lara's participation in running the station because she is an alien. In support of its argument, Ventura cites a provision in the Communications Act which prohibits the Commission from granting a broadcast license to "any corporation of which any officer or director is an alien or of which more than one-fifth of the capital stock is owned of record or voted by aliens." 47 U.S.C. § 310(b)(3) (1982). Although Ms. Lara's ownership clearly is not prohibited by this statutory provision, Ventura argues that the provision evidences a general congressional policy against alien participation in or control of broadcast stations.

As the FCC points out, however, the congressional policy is against *control* by aliens—not against *participation* by aliens. *See Noe v. FCC*, 260 F.2d 739, 742 (D.C.Cir.1958). Ventura argues that it is proposed that Ms. Lara exercise control over the day-to-day affairs of the station. This argument, however, confuses control over certain aspects of the conduct of the station with the congressionally prohibited control in terms of ownership. Nor has Ventura cited any support for an expansive reading of the congressional intent regarding this provision. Consequently, we believe that the FCC's decision to allow integration credit for alien ownership when such ownership is not prohibited by statute to be permissible under Section 310(b)(3). Such a decision clearly falls within the FCC's discretion to determine what will be in the public interest. *See* 47 U.S.C. § 309(a) (1982).

■ 3. *Ventura's factual arguments.* Ventura's other substantive claim is that the Commission erred with respect to specific findings it made in the qualitative integration comparison. Specifically, it argues (1) that Ms. Lara should not have been given more minority management credit than Mr. Dela Pena because of her lack of experience and (2) that Ventura should have been given more broadcast experience and local residence/civic participation credit than it was.

The FCC's decision, however, was supported by substantial evidence. With respect to the minority integration credit, the

FCC noted that the position proposed for Ms. Lara (director of public and minority affairs and assistant program director) was one of significant management responsibility. The FCC also noted that Mr. Dela Pena's proposed position (chief engineer) was one of less significant responsibility.

Ventura argues that this decision was incorrect and that Ms. Lara would not act as effectively as her nominal position denoted, given her lack of experience. The ALJ, however, had noted that inexperience went to the question of credit for past experience, not to the question of minority credit: The Commission has noted in this context that inexperience may be overcome. *See Initial Decision,* 92 FCC2d at 1199, JA 17. In sum, the decision here to award AGR a slight minority preference over Ventura seems a reasoned decision supported by substantial evidence in the record.

Ventura also contends that it should have received more credit for broadcast experience and local residence/civic participation. The decision allowed Ventura slight preferences in these areas, which were supported by substantial evidence. These slight preferences, however, were outweighed by the minority ownership preference (Ms. Lara over Mr. Dela Pena) and the 49 percent female ownership preference for AGR. Taken all together, we find that each specific preference was based on substantial evidence and that the decision overall was reasonably based on that evidence. Consequently, we reject Ventura's claims and affirm the Commission in its selection of AGR over Ventura.

### IV. CONCLUSION

We conclude that the Commission's selection of AGR over Ventura was legally acceptable, procedurally adequate, and supported by substantial evidence in the record. We further conclude, however, that the Commission's refusal to allow spousal attribution of the Shearers' marital joint tenancy interests was inadequately explained. Based on these conclusions, we vacate the grant of the license to AGR and remand the case to the Commission for further proceedings consistent with this opinion.

*So ordered.*